**Opinion filed April 14, 2011**



## In The

# Eleventh Court of Appeals

_____

### No. 11-09-00257-CV

_____

**RACHEL MARIE STEWART, Appellant**

**V.**

**JASON WILLIAM STEWART, Appellee**

**On Appeal from the County Court at Law**

**Nolan County, Texas**

**Trial Court Cause No. CC-5839**

## M E M O R A N D U M   O P I N I O N

This is a divorce proceeding.  The trial court granted Jason William Stewart and Rachel Marie Stewart a divorce, named them joint managing conservators of their three children, gave Jason the exclusive right to designate the children's residence, and divided the couple's property. Rachel filed this appeal, complaining of the trial court's conservatorship ruling and property division.  We affirm.

I. *Facts*

This was a contentious proceeding with both parties concentrating primarily on their criticisms of the other. There was evidence that Rachel was guilty of financial mismanagement before and during the marriage. Before the marriage, Jason paid some of her bills; she applied for phone service under her three-year-old son's name (he was from a prior relationship); and tax liens were filed against her. These liens still have not been paid. Rachel admitted writing several hot checks during the marriage. Jason testified that he has spent $100,000 covering those checks. When Jason filed for divorce, the parties separated. During their separation, Rachel failed to make the house payment, resulting in a default, and she also failed to pay for day care. Rachel testified that she thought Jason had made the January house payment and that she did not know the February payment was due. She acknowledged, however, that the statements were sent to her. During the separation and despite the fact that she was earning only $8.00 an hour and the parties had considerable outstanding debts, she traveled to Las Vegas, the Fort Worth Stock Show, the San Antonio Stock Show, the Houston Stock Show, and the San Angelo Stock Show. She also paid someone $600 a month to wash, feed, and handle her steers, and she renovated a bathroom in the house.

There was testimony of infidelity and alcohol abuse by both parties. During a birthday party for her at Mi Ranchito Restaurant, Rachel became extremely intoxicated. A band was playing at the restaurant, and Rachel ended up passed out in the backseat of a band member's pickup. On another occasion, she and Jason went to the Scurry County Christmas Ball. The same band was playing. She became severely intoxicated, and after the ball, she went to a hotel with the band and ended up in a bathroom with a band member. A third episode occurred at the ranch rodeo. Rachel became intoxicated and told Jason to go away because she was leaving with the band. Jason went home and packed some clothes. According to him, Rachel brought the children to him the next day so that she could sleep off a hangover. A mutual friend of the parties witnessed her assault Jason and cause problems for himself and his ex-wife at a restaurant while intoxicated.

At the time of trial, Rachel was having an affair with a married man, Robert Butchee. A few months before the divorce, Rachel went to Lamesa, where Butchee lived, to purchase show pigs. She should have returned between 9:30 and 10:00 in the evening, but she did not arrive until after midnight. When she did, she was highly intoxicated. There was a twenty-pack of

2

Miller Lite beer in her vehicle, and according to Jason, 75% of the bottles were empty. Miller Lite is the type of beer that Butchee drinks. Rachel admitted that she met with Butchee at the Houston Stock Show and that he provided her with money for her trips.

There was also evidence critical of Jason. He admitted to drinking beer while driving with the kids in his vehicle. Prior to this divorce action, the parties had filed for divorce and were separated. Jason admitted that, during this period of time, he had an affair with one woman and slept with another. He also admitted that, a few days before their originally scheduled divorce hearing, Rachel caught him looking at pornography on the internet. Rachel denied that this was a remote event and contended that it happened much more recently.

The court had other evidence of bad acts by both parents. Rachel did not attend her grandmother's funeral because she was at the National Finals Rodeo in Las Vegas. The date of the funeral was changed while she was out of town, but she knew that her grandmother had passed away before leaving town. Rachel has interfered with the relationship between her oldest son and his father and has been chastised by the trial court for doing so. On one occasion when the trial court ordered her to allow the father access to his son, she told him to be the biggest brat he had ever been. She has told the children that Jason did not love them and has cussed him out in their presence.

The children's family physician described Jason as temperamental and said that he loses his temper easily. He has heard Jason raise his voice with the children and, in fact, has never had anyone else act as poorly as Jason did with the children in his office. Jason has written several checks when there were insufficient funds in his checking account. He incurred $575 in insufficient funds fees one month and $925 the next. Once, while Rachel was driving on the interstate, he turned her car off. He admitted to striking her in the face once and to forging her name on a bank note. Rachel testified that he has bruised the children by spanking them and that he has called her horrible names in front of them.

## II. *Issues*

Rachel challenges the trial court's judgment with two issues. She contends that the trial court abused its discretion by giving Jason the exclusive right to designate the children's residence because its decision was based on legally and factually insufficient evidence and that it also abused its discretion by failing to consider the tax consequences of awarding her wind energy royalty income that had been pledged to pay a community debt.

3

### III. *Standard of Review*

We review a trial court's decision on custody, control, possession, and visitation matters as well as division of the community estate for abuse of discretion and reverse the trial court's order only if we determine from reviewing the record as a whole that the trial court abused its discretion. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982). A trial court abuses its discretion only if it acts arbitrarily or unreasonably, without reference to any guiding rules or principles. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

Under an abuse of discretion standard, legal and factual sufficiency challenges to the evidence are not independent grounds of error but are relevant factors in assessing whether the trial court abused its discretion. *Child v. Leverton*, 210 S.W.3d 694, 696 (Tex. App.—Eastland 2006, no pet.). When, as here, the appellant contends the abuse of discretion results from insufficient evidence, we engage in a two-pronged inquiry: (1) whether the trial court had sufficient information on which to exercise its discretion and (2) whether the trial court erred in its application of discretion. *Id.* The traditional sufficiency review comes into play with regard to the first question; however, the inquiry does not end there. We then proceed to determine whether, based on the evidence, the trial court made a reasonable decision. *Id.*

In a legal sufficiency review, we view the evidence in a light favorable to the finding, crediting favorable evidence if a reasonable factfinder could do so and disregarding contrary evidence unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). The evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the verdict under review. *Id*. at 827-28. We may sustain a no-evidence challenge only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the only evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *Id.* at 810. In reviewing the factual sufficiency of the evidence, we examine all of the evidence and set aside a finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

The best interest of the child is the primary consideration in determining issues of conservatorship. TEX. FAM. CODE ANN. § 153.002 (Vernon 2008); *In re V.L.K.*, 24 S.W.3d 338, 342 (Tex. 2000). Because the trial court faces the parties, observes their demeanor, and has an

opportunity to evaluate the claims made by each parent, the trial court has wide latitude in determining the child's best interest. *Gillespie*, 644 S.W.2d at 451. When addressing conservatorship issues, courts may use the non-exhaustive list of *Holley* factors to determine the child's best interest. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). The *Holley* factors include the following: (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) parental abilities of the individuals involved, (5) programs available to those individuals to promote the best interest of the child, (6) plans for the child by these individuals, (7) stability of the home or proposed placement, (8) acts or omissions of the parent that may indicate that the existing parent-child relationship is not proper, and (9) any excuse for the acts or omissions of the parent. *Id*.

IV. *The Right to Designate the Children's Primary Residence*

Rachel argues that, when the trial court decided to give Jason the right to designate the children's primary residence, it had insufficient evidence upon which to inform its exercise of discretion. The trial court made a number of findings of fact in connection with this decision. Specifically, the court found:

a. Jason William Stewart can best provide for the physical, psychological and emotional needs of the children.

b. The incidents of Rachel Marie Stewart's alcohol use pose a potential physical danger to the children now and in the future.

c. The stability of Jason William Stewart's home is marginally better than that of Rachel Marie Stewart.

d. Jason William Stewart has demonstrated a greater ability to give the children first priority.

e. Neither Jason William Stewart nor Rachel Marie Stewart have the ability to reach shared decisions in the best interest of the children.

f. Jason William Stewart and Rachel Marie Stewart have both engaged in corporal punishment and exhibit tendencies to anger quickly.

g. Jason William Stewart and Rachel Marie Stewart have both, at one time or another, been the primary caregiver for the children in the absence of the other parent.

h. No evidence was presented to rebut the presumption that the siblings should not be separated.

i. Neither Jason William Stewart nor Rachel Marie Stewart presented credible evidence of their stability to promote a positive relationship between the children and the other party.

j. There have been instances of family violence, involving the use of abusive physical force between the parents, if not in the presence of, then in the immediate proximity of the children.

k. Rachel Marie Stewart's continued abuse of alcohol denotes an ongoing alcohol problem that relates to the Respondent's fitness to act as a parent.

l. Rachel Marie Stewart had an (extramarital) affair with a married individual during the time of the marriage and continuing during the period of separation.

m. Rachel Marie Stewart has engaged in conduct denying and/or interfering with the parenting time provided to the father of her older child who is not the subject of this suit.

Rachel challenges several of these findings. For example, she acknowledges that there was evidence of alcohol abuse but points out that none of the events occurred around the children and that Jason admitted to drinking a beer while driving with the children. However, there was evidence that at least one of the children was present at Rachel's birthday party while she was drinking tequila straight from the bottle. Furthermore, Jason testified that Rachel, while intoxicated, drove with the children on three or four occasions. The trial court could find this testimony credible. But even if the children did not actually witness Rachel while intoxicated or ride with her while she was impaired, the events evidencing her alcohol abuse were so dramatic as to provide the trial court with cause for concern. Jason's admission that he drank beer while driving with the children is also disconcerting, but the trial court could draw a distinction between it and Rachel's alcohol abuse because of the lack of evidence that Jason was ever impaired.

Rachel also challenges the trial court's finding that Jason's home was marginally more stable than hers, and she complains that this finding is unclear. We note first that Rachel did not request additional findings and, therefore, has not preserved any complaint about the clarity of this finding. Moreover, the trial court had sufficient evidence upon which to make this finding.

In addition to the alcohol abuse and financial mismanagement evidence, the court had evidence that Rachel was unable to maintain constant employment. She held a number of different jobs during the marriage, was unemployed for eight months, and eventually went to work for EON adjusting land damage. She was fired from that job and, at the time of trial, was working as a receptionist. She was earning $8.00 an hour but had taken off "quite a bit" from work. Finally, she was involved in an affair with a married man.

Rachel next challenges the trial court's finding that Jason demonstrated a greater ability to make the children his first priority. Rachel assumes that this finding was the result of her failure to attend her grandmother's funeral. If so, she notes that the date of the funeral was changed after she left town and that the children were taken care of in her absence. The parties were separated, and Rachel left the children with Jason. The trial court could consider that Rachel knew her grandmother had passed away before she left town but that she chose to go to the National Finals Rodeo nonetheless – even though she lacked the financial resources to make such a trip. The trial court could also consider that Rachel applied for credit in her three-year-old son's name and that, while the parties were separated, she made several trips to stock shows without the children. Rachel's absences, her decision to go to Las Vegas, and her spending money that she did not have could all reasonably be considered by the trial court as evidence of her priorities. If so, the trial court's finding has adequate support.

The trial court found that Rachel had an affair with a married man both during the marriage and during the parties' separation. Rachel does not dispute this finding but points out that Jason had two affairs and that he was looking at internet pornography while she was pregnant. Jason testified that his two affairs and his internet pornography viewing occurred during the parties' first separation. Rachel disputed Jason's testimony and contended that he has looked at pornography much more recently, but the trial court could reasonably find Jason's testimony more credible. The trial court could also distinguish between an affair during a period of separation and one that started during the marriage.

Finally, Rachel challenges the sufficiency of the evidence that she interfered with her oldest son's visitation with his father. Rachel admitted that she had been to court several times over visitation issues concerning her son, that she had been reluctant to promote a relationship between her son and his father, and that she had been chastised for not allowing visitation. Jason testified that Rachel had denied the father access and that the trial court had ordered her to

provide him with access. Jason also testified that, after that hearing, Rachel told her son to throw a fit when he did not get his way. This evidence is sufficient to support the trial court's finding.

Between the undisputed evidence and the conflicting evidence that could be resolved in Jason's favor, the trial court had sufficient evidence upon which to make each of the challenged findings of fact. Collectively, the findings sufficiently informed the trial court's exercise of its discretion. Issue One is, therefore, overruled.

## V. *Wind Energy Royalty*

Rachel complains that the trial court abused its discretion by dividing the community property because she was awarded one-half of the wind royalty income. Her complaint is that, because the royalty is pledged to secure a mortgage, she does not actually receive it but is still taxed on it. Rachel contends that the trial court failed to appreciate the tax consequences of its division and that this division could result in an inequitable property division.

Texas law requires trial courts to divide the estate of the parties in a manner that is just and right, having due regard for the rights of each party. TEX. FAM. CODE ANN. § 7.001 (Vernon 2006). There is no requirement that the court effectuate an equal division. *Murff v. Murff*, 615 S.W.2d 696, 699 (Tex. 1981). In reviewing the equitable remedy fashioned by the trial court, we must determine not only whether the trial court's findings are supported by the evidence, but also whether error, if established, caused the trial court to abuse its discretion. *Garcia v. Garcia*, 170 S.W.3d 644, 649 (Tex. App.—El Paso 2005, no pet.). We must indulge every reasonable presumption in favor of the trial court's proper exercise of its discretion in dividing marital property. *Pletcher v. Goetz*, 9 S.W.3d 442, 446 (Tex. App.—Fort Worth 1999, pet. denied).

The initial concern Rachel's argument presents is her criticism of the trial court for not considering evidence she did not offer. There was testimony about the parties' liability for past taxes, but neither party offered the trial court any tax consequence evidence. Consequently, we do not know what the tax consequences to her will be or how they affect the division of the marital estate. Second, because Jason will have the same imputed income, the record does not reflect disparate treatment. Third, Rachel herself testified that she was aware the royalty income was pledged. She then asked the court to split that income. Consequently, she is complaining of an award that she requested.[1]

---

[1] We note that the wind royalty income is pledged to pay an indebtedness on farm land and that Rachel also asked for one of the parties' two farm tracts. Her request for one-half of the royalty income was not conditioned upon receipt of a farm tract.

Finally, Rachel offers no suggestion for what the trial court should have done beyond consider the tax consequences of the wind royalty award. The parties had assets totaling $1,514,388 and liabilities totaling $1,470,425.50. Jason received an estate with a negative net equity (-$8,357.50). Rachel received an estate with a positive net equity ($52,320). The wind royalty is pledged to pay a mortgage on land Jason is receiving, but he is also responsible for the majority of the parties' debt, including past taxes of $56,626. The trial court treated Rachel's share of the pledged royalty income, $60,909.50, as a contribution to the parties' general unsecured debt but made Jason primarily responsible for that debt. Because Rachel is receiving a disproportionate share of the marital estate and is primarily responsible for less than 15% of their debt, we cannot conclude that the trial court abused its discretion by awarding her one-half of the wind royalty. Issue Two is overruled.

## VI. *Conclusion*

The judgment of the trial court is affirmed.


RICK STRANGE

JUSTICE


April 14, 2011

Panel consists of:  Wright, C.J.,
McCall, J., and Strange, J.

9